IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Vincent Ennis Lewis, | ) | C/A No.: 1:13-3445-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.      Relevant Background

        A.      Procedural History

On June 4, 2010, Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began on January 1, 2005. Tr. at 137–38, 141–48. His applications were denied initially and upon reconsideration. Tr. at 63–66, 67–70, 75–76. On June 4, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ")

Augustus C. Martin. Tr. at 25– (Hr'g Tr.). The ALJ issued a partially-favorable decision on August 7, 2012, finding that Plaintiff was not disabled prior to June 4, 2010, but became disabled on that date and continued to be disabled through the date of the decision. Tr. at 9–22. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 10, 2013. [ECF No. 1].

> B.    Plaintiff's Background and Medical History

> > 1.    Background

Plaintiff was 55 years old at the time of the hearing. Tr. at 31. He completed high school and nearly two years of college. Tr. at 32. His past relevant work ("PRW") was as an extruder machine operator and a mattress sewer. Tr. at 49. He alleges he has been unable to work since January 1, 2005. Tr. at 31.

> > 2.    Medical History

On March 9, 2005, Plaintiff presented to Roper Hospital with high blood sugar after having discontinued his diabetes medication. Tr. at 278. His glucose was 437 mg/dL and his creatinine was slightly elevated at 1.4 mg/dL, but his hemoglobin was normal at 17.0 g/dL. Tr. at 279. He was administered insulin and discharged home. *Id.*

Jason E. Berendt, M.D., treated Plaintiff for diabetes in March and April 2005 . Tr. at 683–96. He prescribed medications, and Plaintiff's symptoms improved. *Id.* Although

Plaintiff was diagnosed with renal insufficiency, Dr. Berendt noted that this was likely acute renal insufficiency secondary to volume depletion. Tr. at 693.

Plaintiff presented to Sophie Fowler, NP, on September 20, 2006, to establish treatment. Tr. at 751. Plaintiff indicated that he stopped taking his diabetes medications two years earlier when he lost his job and ran out of money. *Id.* He complained of blurred vision secondary to cataracts, but indicated that he could not have surgery for cataracts until his diabetes was controlled. *Id.* Plaintiff's blood sugar was 447, but the examination was otherwise normal. *Id.*

Plaintiff followed up with Ms. Fowler on September 29, 2006, regarding blood test results. Tr. at 750. Plaintiff indicated he was attempting to change his diet, but his blood sugars were running in the 200s to 300s. *Id.* Plaintiff's blood pressure was elevated, and Ms. Fowler indicated that she would consider adding blood pressure medication at his next visit. *Id.*

Plaintiff presented to E.M. Newton, M.D., on October 13, 2006. Tr. at 749. Dr. Newton indicated Plaintiff had been off all medications when Plaintiff presented to his office and that his A1C was 14.6 mg/dL and his blood sugars were in the 300s. *Id.* Dr. Newton prescribed 10 units of Lantus insulin in the morning. *Id.*

Plaintiff followed up with Dr. Newton on November 2, 2006. Tr. at 748. Dr. Newton noted that Plaintiff's blood sugar was decreasing. *Id.*

Laboratory testing on November 13, 2006, indicated normal blood urea nitrogen ("BUN") and creatinine.  Tr. at 814.

Plaintiff followed up with Ms. Fowler on November 30, 2006. Tr. at 747. Ms. Fowler noted that Plaintiff's blood sugars were good and that his compliance had improved. *Id.*

On February 22, 2007, Plaintiff complained to Dr. Newton that he was having difficulty obtaining a job because of vision problems. Tr. at 746. Plaintiff's BUN and creatinine were normal. Tr. at 811.

Treatment notes from Robert E. Peyser, M.D., indicate Plaintiff was diagnosed with mild diabetic retinopathy, bilateral cataracts, and iridcyclitis. Tr. at 678–79. In a letter dated February 28, 2007, Dr. Peyser noted Plaintiff's vision was 20/25 in his right eye and 20/40 to 20/200 in the left eye. Tr. at 727. Dr. Peyser observed bilateral cataracts, worse on the left than on the right. *Id.* He performed left cataract surgery on March 15, 2007, and right cataract surgery on April 16, 2007. Tr. at 729, 730.

On April 5, 2007, Plaintiff reported to Dr. Newton that he could see much better following his left eye surgery. Tr. at 745. Dr. Newton noted that Plaintiff's A1C had decreased from 14.6 mg/dL in September 2006 to 9.1 mg/dL in February 2007. *Id.*

Plaintiff followed up with Dr. Newton on June 7, 2007. Tr. at 744. Although the treatment notes from this visit are largely illegible,[1] it appears that Dr. Newton prescribed

---

[1] During the hearing, the ALJ and Plaintiff's attorney discussed deficits in the record and the fact that Dr. Newton's notes were difficult to read. Tr. at 42. The ALJ requested that Plaintiff's attorney obtain interpretation of the treatment notes and clarification from Dr. Newton regarding Plaintiff's abilities prior to June 30, 2009. Tr. at 43. At the end of the hearing, the ALJ agreed to hold the record open for 30 days after the hearing to allow Plaintiff's attorney time to obtain additional information from Dr. Newton. Tr. at 51. The record reflects that Plaintiff's attorney submitted additional records from Dr. Newton on June 13, 2010, for the period from September 20, 2006, through December 8, 2009. Tr. at

a four-month supply of Plaintiff's medications. *Id.* Laboratory tests indicated Plaintiff's BUN was elevated at 26.0, but his creatinine was normal at 1.2. Tr. at 807.

In a letter dated June 29, 2007, Dr. Peyser wrote that Plaintiff had uneventful cataract surgery and that his vision was restored to 20/20 bilaterally. Tr. at 728.

Plaintiff presented to Dr. Newton complaining of back pain on October 11, 2007. Tr. at 743. Dr. Newton administered a Toradol injection and prescribed pain medication. *Id.*

Plaintiff followed up with Dr. Newton on October 15, 2007, and reported that his back was feeling much better. Tr. at 742. Dr. Newton refilled Plaintiff's prescriptions for diabetes and high blood pressure medications. *Id.* Lab tests indicated Plaintiff's BUN was slightly elevated at 23.0 mg/dL, but his creatinine and estimated glomerular filtration rate ("GFR") were normal at 1.2 mg/dL and 82.4 mL/minute, respectively. Tr. at 806.

Plaintiff presented to the emergency department at St. Francis Hospital on April 13, 2009, complaining of nausea, vomiting, and abdominal pain. Tr. at 269. His hemoglobin was slightly reduced at 11.5 g/dL. Tr. at 273. His BUN was normal at 22.0 mg/dL. *Id.* His creatinine was slightly high at 1.4 mg/dL. *Id.* His estimated GFR was normal at 68 mL/min. *Id.*

On April 15, 2009, Plaintiff presented Dr. Newton to follow up after his visit to the emergency room. Tr. at 325. Plaintiff reported a recent onset of decreased energy and feeling like he was going to black out. *Id.* Plaintiff's glucose was elevated at 405 mg/dL.

732–819. However, that evidence did not include transcribed treatment notes or any indication from Dr. Newton as to Plaintiff's abilities prior to Plaintiff's date last insured.

Tr. at 799. However, his creatinine was normal at 1.2 mg/dL, his BUN was normal at 22.0 mg/dL, and his estimated GFR was normal at 81.8 mL/minute. *Id.*

Plaintiff followed up with Dr. Newton on April 17, 2009, reporting he had not taken his diabetes medication for over a year. Tr. at 324. His A1C was 13.4 mg/dL, but his creatinine was within normal range at 1.2. *Id.* Dr. Newton observed an abscess on Plaintiff's neck, but the examination was otherwise normal. *Id.* Dr. Newton prescribed medications, including insulin. *Id.*

Blood tests on April 27, 2009, revealed Plaintiff's creatinine to be high at 1.7 mg/dL and his BUN to be high at 32.0. Tr. at 784.

Plaintiff followed up with Dr. Newton on May 15, 2009. Tr. at 323. Dr. Newton indicated Plaintiff's A1C was elevated at 12.8 mg/dL and his creatinine had increased from 1.2 mg/dL to 1.7 mg/dL. *Id.* However, a blood test from May 15, 2009, indicates Plaintiff's creatinine had decreased to 1.4 mg/dL, and his estimated GFR was normal at 68.4 mL/minute. Tr. at 783. His BUN was elevated at 33.0 mg/dL. *Id.* Plaintiff's hemoglobin was 10.7 g/dL. Tr. at 323. Dr. Newton's examination of Plaintiff was otherwise normal. *Id.*

On June 15, 2009, Plaintiff followed up with Dr. Newton. Tr. at 322. His blood pressure was elevated at 164/88. *Id.* Although the treatment notes are somewhat illegible, it appears that Dr. Newton noted no abnormalities on examination. *Id.* Blood test results from this visit indicate Plaintiff's creatinine was high at 1.5 mg/dL and his BUN was high at 36.0 mg/dL, but his estimated GFR was within the normal range at 63.2 mL/minute. Tr. at 781.

Plaintiff followed up with Dr. Newton on July 15, 2009, who noted Plaintiff was "doing well." Tr. at 321. Dr. Newton noted a gradual decrease in Plaintiff's hemoglobin, which was 9.3 g/dL. *Id.*, Tr. at 778. Plaintiff's creatinine was again elevated at 1.5 mg/dL and his BUN was elevated at 31.0 mg/dL, but his estimated GFR was within normal limits at 63.2 mL/minute. Tr. at 778–79.

Plaintiff followed up with Dr. Newton on August 12, 2009. Tr. at 320. Dr. Newton's notes, while largely illegible, indicate Plaintiff was "doing great." *Id.* His A1C had decreased to 7.7 mg/dL. *Id.* Plaintiff's creatinine was elevated at 1.7 mg/dL, his BUN was elevated at 37.0 mg/dL, and his estimated GFR had declined to 54.7 mL/minute. Tr. at 755. Plaintiff's hemoglobin had increased from 9.9 g/dL to 10.0 g/dL, and Dr. Newton noted no abnormalities during the physical examination. Tr. at 320.

Plaintiff followed up with Dr. Newton on October 12, 2009. Tr. at 319. Plaintiff's creatinine had increased to 2.2, his BUN had increased to 38.0 mg/dL, and his estimated GFR had decreased to 40.6 mL/minute. Tr. at 755.

Plaintiff presented to the emergency department at St. Francis Hospital on October 24, 2009, complaining of nausea. Tr. at 259. Plaintiff's hemoglobin was low at 8.8 g/dL. Tr. at 263. He had elevated BUN at 30.0 mg/dL, elevated creatinine at 1.7 mg/dL, and decreased GFR at 55.0 mL/minute. *Id.*

On November 20, 2009, Plaintiff followed up with Dr. Newton. Tr. at 318. Treatment notes from this visit are largely illegible. Plaintiff's A1C had decreased to 6.8 mg/dL. *Id.* His estimated GFR was 51.5 mL/minute, his creatinine was 1.7 mg/dL, and

his BUN was 32 mg/dL. Tr. at 764–65. The record appears to indicate Dr. Newton referred Plaintiff to see Dr. Keogh, but Plaintiff had not yet seen him. Tr. at 318.

Plaintiff followed up with Dr. Newton on December 8, 2009. Tr. at 317. Dr. Newton indicated that Plaintiff's creatinine had previously increased from 1.5 g/dL to 2.2 g/dL, but that it had recently decreased to 1.7 g/dL. *Id.* However, testing on December 8, 2009, indicated Plaintiff's creatinine had again increased to 2.2 mg/dL. Tr. at 762. His estimated GFR had decreased to 38.2 mL/minute and his BUN had increased to 51.0 mg/dL. *Id.* Dr. Newton noted Plaintiff's hemoglobin was low at 8.0 and that he had been referred to a gastroenterologist to rule out blood loss. Tr. at 317. Dr. Newton assessed insulin-dependent diabetes mellitus, chronic renal insufficiency, iron-deficiency anemia, hematuria, and GERD. *Id.*

A capsule endoscopy performed on December 29, 2009, indicated no gross blood or bleeding site in the small bowel. Tr. at 752.

On January 8, 2010, Dr. Newton noted that Plaintiff's last hemoglobin was low at 8.0 g/dL and his last creatinine was increased from 1.7 mg/dL to 2.2 g/dL. Tr. at 316.

On February 12, 2010, Dr. Newton reported Plaintiff was "doing well." Tr. at 315. While his A1C was 6.1 and his creatinine had decreased from 2.2 to 1.7, his hemoglobin was low. *Id.* Dr. Newton referred Plaintiff to a hematologist. *Id.*

Plaintiff followed up with Dr. Newton on March 12, 2010. Tr. at 314. Treatment notes indicate Plaintiff "feels ok," but was "a little tired." Id. Dr. Newton indicated Plaintiff's creatinine was increasing and his hemoglobin was decreasing. *Id.*

Plaintiff followed up with Dr. Newton on April 9, 2010. Tr. at 313. Treatment notes from this visit are largely illegible, but Dr. Newton indicated Plaintiff's gait and station were normal. *Id.*

Plaintiff followed up with Dr. Newton on May 6, 2010. Tr. at 312. While notes from this visit are generally illegible, Dr. Newton did seem to note Plaintiff "[f]eels good overall." *Id.* Dr. Newton also noted steady increases in Plaintiff's creatinine and steady decreases in his hemoglobin. *Id.*

Plaintiff presented to George Keogh, M.D., for an initial examination on May 12, 2010. Tr. at 236–37. Dr. Keogh assessed moderately severe anemia with microcytosis and known sickle cell trait, chronic renal insufficiency, hypertension, and diabetes. Tr. at 237. Dr. Keogh noted that Plaintiff had experienced a gradual decline in hemoglobin, possibly caused by renal insufficiency. *Id.*

A limited retroperitoneal ultrasound on May 26, 2010, indicated no focal abnormality of either kidney and no hydronephrosis. Tr. at 250.

Plaintiff underwent multiple lab tests in May and June 2010, which revealed multiple abnormalities, including low white blood cell count, low red blood cell count, high glucose, high BUN, high creatinine, high alkaline phosphate, low serum albumin, and high ferritin. Tr. at 238–49.

Plaintiff followed up with Dr. Newton on June 4, 2010. Tr. at 311. The notes from this visit are generally illegible, but Dr. Newton indicated that Plaintiff saw Dr. Keogh. *Id.* Dr. Newton noted Plaintiff's creatinine slowly increased over the prior year. *Id.* He

assessed insulin-dependent diabetes mellitus, increased creatinine, anemia, and other problems that are illegible. *Id.*

Plaintiff followed up with Dr. Keogh on June 16, 2010. Tr. at 235. He reported feeling well and having no significant fatigue. *Id.* Dr. Keogh's impressions included severe microcytic anemia, worsening thrombocytopenia, mild leukopenia, sickle cell trait, and chronic renal insufficiency. *Id.* Dr. Keogh referred Plaintiff for bone marrow biopsy and blood transfusion. *Id.*

Plaintiff presented to the emergency department at St. Francis Hospital on June 16, 2010, feeling weak and tired. Tr. at 252. He was administered sodium chloride and discharged home. Tr. at 253, 257.

Plaintiff presented to the emergency department at Roper Hospital again on June 18, 2010, complaining of hypertension after undergoing blood transfusion. Tr. at 292. Plaintiff was prescribed antihypertensive medication and discharged home. Tr. at 296. The discharge instructions also note a diagnosis of kidney failure. Tr. at 298.

Plaintiff followed up with a provider in Dr. Newton's office on July 2, 2010. Tr. at 310. Plaintiff's prescription for Norvasc was refilled and he was referred to a nephrologist. *Id.* Diabetes mellitus, hypertension, anemia, and increased creatinine were assessed. *Id.*

Plaintiff presented to Samuel C. Franklin, Jr., M.D., at Charleston Nephrology Associates, LLC, for an initial evaluation of chronic kidney disease on July 9, 2010. Tr. at 326. Plaintiff indicated he was feeling well and voiced no complaints. *Id.* Laboratory testing revealed several abnormalities. Tr. at 327–28. Dr. Franklin diagnosed stage three

chronic kidney disease, anemia, gout, hypertension, proteinuria, and hematuria. Tr. at 329.

Plaintiff followed up with Dr. Newton on July 16, 2010. Tr. at 309. Treatment notes from this visit are generally illegible. Dr. Newton indicated Plaintiff had abnormal gait. *Id.* He assessed insulin-dependent diabetes mellitus, anemia, chronic kidney disease, and gout. *Id.*

On July 23, 2010, Plaintiff followed up with Crystal D. White, PA, at Charleston Nephrology Associates, LLC. Tr. at 331. He reported fatigue, edema, and dysuria. *Id.* Ms. White noted trace edema on examination. Tr. at 332. Multiple abnormalities were again noted in laboratory tests. Tr. at 332–33. Ms. White recommended Plaintiff undergo renal biopsy. Tr. at 334.

Plaintiff followed up with Suzan M. Kleckley, ANP, at Charleston Nephrology Associates, LLC, on August 27, 2010. Tr. at 376. Ms. Kleckley noted Plaintiff's blood pressure was uncontrolled and that he continued to have fatigue, but noted that his fatigue was better overall. *Id.* Plaintiff had bilateral trace edema. Tr. at 377. Multiple abnormalities were noted on laboratory tests, including elevated creatinine and low hemoglobin. Tr. at 376–78.

On October 8, 2010, Plaintiff followed up with Dr. Keogh, who recommended that he proceed with renal biopsy to clarify the etiology of his chronic renal insufficiency. Tr. at 397.

Laboratory testing performed on October 11, 2010, revealed creatinine of 3.3 mg/dL, hemoglobin of 10.6 g/dL, and several other abnormalities. Tr. at 364, 366.

State agency medical consultant Cleve Hutson, M.D., completed a physical residual functional capacity assessment on October 25, 2010, in which he indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; and sit (with normal breaks) for a total of about six hours in an eight-hour workday. Tr. at 368–75. Dr. Hutson indicated there was insufficient evidence to rate Plaintiff's residual functional capacity from January 1, 2005, through June 30, 2009. Tr. at 369.

Plaintiff followed up with Dr. Franklin on November 22, 2010, who noted Plaintiff had stage four chronic kidney disease. Tr. at 420. Plaintiff complained of easy fatigability, and Dr. Franklin recommended he proceed with renal biopsy. Tr. at 420, 422.

Plaintiff followed up with Dr. Keogh on November 29, 2010. Tr. at 395. Plaintiff had mildly prolonged prothrombin time ("PT") and partial thromboplastin time ("PTT"). *Id.* Plaintiff agreed to undergo platelet function analysis. *Id.*

Plaintiff underwent renal biopsy on December 27, 2010, which revealed foci of moderate acute tubular epithelial cell injury, diabetic glomerulosclerosis, severe arteriolosclerosis, marked interstitial fibrosis, and marked arteriosclerosis. Tr. at 405.

Plaintiff followed up with Dr. Franklin on January 10, 2011, complaining of easy fatigability, occasional nausea, and urinary frequency. Tr. at 423. Laboratory testing indicated multiple abnormalities. Tr. at 424. Dr. Franklin noted a rapid decline in Plaintiff's glomerular filtration rate ("GFR") and referred Plaintiff to MUSC for initial transplant evaluation. *Id.*

On March 22, 2011, Plaintiff followed up with Dr. Franklin. Tr. at 426. Laboratory testing indicated significantly high creatinine and total urine protein. Tr. at 427. Dr. Franklin discussed with Plaintiff and his wife Plaintiff's long-term prognosis and plans, including transplant, medications, and dialysis. Tr. at 428.

On June 3, 2011, Plaintiff reported a two-week history of worsening edema, fatigue, shortness of breath, anorexia, and nausea to Dr. Franklin. Tr. at 431. Dr. Franklin assessed stage five chronic kidney disease. Tr. at 433. Plaintiff indicated that he was not yet ready to start dialysis. Tr. at 431. Dr. Franklin prescribed Plaintiff diuretics, but informed Plaintiff that he would need to proceed with dialysis if diuretics failed. Tr. at 433.

Plaintiff followed up with Ms. Kleckley on June 10, 2011. Tr. at 434. Plaintiff had 2+ pitting edema. Tr. at 435. His renal function was stable. *Id.*

Plaintiff was examined by Ms. Kleckley on July 8, 2011. Tr. at 437. She noted that Plaintiff had completed the workup for kidney transplant and that they were hopeful he would be listed for transplant soon. *Id.* She referred Plaintiff to Dr. Tonnessen for native arteriovenous fistula ("AVF") creation. Tr. at 438.

Plaintiff presented to Britt H. Tonnessen, M.D., for initial consultation on July 29, 2011. Tr. at 463. Dr. Tonnessen recommended left brachiocephalic AVF. Tr. at 464.

On August 3, 2011, Dr. Tonnessen performed left brachiocephalic AVF creation. Tr. at 468.

Plaintiff followed up with Ms. Kleckley on August 5, 2011, who noted Plaintiff was actively listed for kidney transplant. Tr. at 440.

13

Plaintiff presented to Dr. Franklin on September 2, 2011, complaining of massive edema, fatigue, anorexia, and dyspnea with exertion. Tr. at 450. Plaintiff weighed 280 pounds. *Id.* He was admitted to Roper Hospital to initiate dialysis. Tr. at 452.

Plaintiff was hospitalized at Roper Hospital September 2–10, 2011. Tr. at 458. On September 5, 2011, Plaintiff underwent placement of a tunneled hemodialysis catheter. Tr. at 453.

On September 30, 2011, Dr. Tonnessen noted Plaintiff was receiving dialysis on Tuesdays, Thursdays, and Saturdays and had lost 70 pounds of fluid weight. Tr. at 587.

On October 11, 2011, state agency medical consultant S. Farkas, M.D., completed a physical residual functional capacity assessment in which he indicated Plaintiff was limited as follows: occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; frequently balance; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; and avoid even moderate exposure to hazards. Tr. at 501–08. Dr. Farkas indicated that there was insufficient evidence to determine Plaintiff's residual functional capacity from his alleged onset date to his date last insured. Tr. at 506.

On March 1, 2012, Dr. Newton noted that Plaintiff continued to receive dialysis three times per week. Tr. at 656.

C.      The Administrative Proceedings

    1.      The Administrative Hearing

        a.      Plaintiff's Testimony

At the hearing on June 4, 2012, Plaintiff testified he lived with his wife and 11-year-old daughter. Tr. at 32. Plaintiff indicated he had a driver's license, but his wife frequently drove him. Tr. at 33.

Plaintiff testified he was five feet, eight or nine inches tall. Tr. at 34. He indicated he weighed a little over 200 pounds between 2005 and 2009. *Id.* He stated he was right-handed. *Id.* Plaintiff testified he used a cane to ambulate and had done so in 2009. *Id.* He stated Dr. Newton suggested he use a cane. *Id.*

Plaintiff testified he worked as an ABS machine operator from 1990 until April 15, 2004. Tr. at 35. He indicated he also operated a printing machine. Tr. at 36.

Plaintiff testified he stopped working because he was constantly sick and was having difficulty performing his job. Tr. at 41. He stated he had low blood pressure and anemia and felt tired and drained all the time. Tr. at 46.

Plaintiff testified that between 2005 and 2009, he had diabetes, high cholesterol, high blood pressure, anemia, and cataracts. Tr. at 37. Plaintiff indicated he was diagnosed with kidney disease in 2009, when he was gaining weight because his kidneys were not flushing fluids out properly. Tr. at 38–39. He stated his doctors told him not perform any strenuous activities. Tr. at 40.

Plaintiff testified that he lost 73 pounds within two weeks after being placed on dialysis in 2011. Tr. at 44.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") David M. Boatner reviewed the record and testified at the hearing. Tr. at 49–53. The VE categorized Plaintiff's PRW as an extruder machine operator, which is classified in the *Dictionary of Occupational Titles* ("*DOT*") as medium in exertional level with a specific vocational preparation ("SVP") of 5, and as a mattress sewer, which is classified in the *DOT* as medium in exertional level with a SVP of 3. Tr. at 49. The ALJ asked if there were any transferable skills from Plaintiff's PRW to the light or sedentary exertional level. Tr. at 50. The VE testified that there were no transferable skills. *Id.*

### 2.    The ALJ's Findings

In his decision dated August 7, 2012, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2009.
2.  The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.  Since the alleged onset date of disability, January 1, 2005, the claimant has had the following severe impairments: diabetes mellitus, renal disease, and anemia (20 CFR 404.1520(c) and 416.920(c)).
4.  Since the alleged onset date of disability, January 1, 2005, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.  After careful consideration of the entire record, the undersigned finds that prior to June 4, 2010, the date the claimant became disabled, the claimant had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for six hours each in an eight-hour workday, with normal breaks.

6.     After careful consideration of the entire record, the undersigned finds that beginning on June 4, 2010, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can never climb ladders, ropes, or scaffolds, but he can occasionally perform the other postural movements of balancing, stooping, kneeling, crouching, and crawling. The claimant must avoid even moderate exposure to hazards, such as unprotected heights or dangerous, moving machinery.

7.     Since January 1, 2005, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.     Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. The claimant's age category has not changed since the established disability onset date. (20 CFR 404.1563 and 416.963).

9.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.     Prior to June 4, 2010, transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled" whether or not the claimant has transferable job skills. Beginning on June 4, 2010, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.     Prior to June 4, 2010, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12.     Beginning on June 4, 2010, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

13.     The claimant was not disabled prior to June 4, 2010, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

14.     The claimant was not under a disability within the meaning of the Social Security Act at any time through June 30, 2009, the date last insured (20 CFR 404.315(a) and 404.320(b)).

Tr. at 15–21.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to obtain expert testimony regarding his onset date; and

2)    the ALJ's RFC assessment is not supported by substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

20

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Expert Testimony

Plaintiff argues that the ALJ erred in failing to obtain expert testimony to establish his onset date of disability. [ECF No. 15 at 8]. Plaintiff further argues that the onset date determined by the ALJ was not supported by substantial evidence. *Id.* at 10.

The Commissioner argues that the ALJ was not required to obtain testimony from a medical expert because the ALJ did not infer the onset date of Plaintiff's disability, but rather relied upon a medical opinion that based the onset date on the medical evidence. [ECF No. 17 at 5]. The Commissioner maintains that the ALJ's finding was well-supported by substantial evidence. *Id.* at 9.

For a claimant with a disabling condition of nontraumatic origin, the onset date should be determined by considering the individual's statements as to when disability began, the day the impairment caused the individual to stop work, and the medical and

other evidence concerning impairment severity. SSR 83-20. The onset date alleged by the claimant should be used if it is consistent with all the evidence available, but when the date alleged by the claimant is inconsistent with the other evidence, additional development may be needed to reconcile the conflict. *Id.* The established onset date must be consistent with the medical evidence and the facts in the case record. *Id.*

The length of time "the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case" and must be based on the medical evidence. *Id.* When an onset date must be inferred, the ALJ should call on the services of a medical advisor to testify at the hearing. *Id.*

The ALJ is required to "consult a medical advisor after the claimant has proved that his condition is disabling, but when the date of its onset remains ambiguous." *Bird v. Commissioner*, 699 F.3d 337, 344 (4th Cir. 2012); *see Bailey v. Chater*, 68 F.3d 75 (4th Cir. 1995).

"The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death." SSR 83-20. "Convincing rationale must be given for the date selected." *Id.*

To support his decision that Plaintiff was capable of performing a full range of light work prior to June 4, 2010, the ALJ found that "treatment notes simply fail to indicate the level of dysfunction the claimant is alleging prior to June 4, 2010." Tr. at 17. He further indicated "the claimant suffers from diabetes mellitus, renal disease, and

anemia, which are severe impairments, but not to the extent of being disabling." *Id.* He noted that there were no medical records indicating that Plaintiff's physical impairments caused him to stop working on January 1, 2005; that Plaintiff received relatively minimal medical treatment for any of his conditions prior to June 3, 2010; that there was no mention of renal insufficiency through June 3, 2010, except for the incident in March 2005; that Plaintiff had treatment lapses of a year or more on two occasions; and that the record did not support a diagnosis of anemia prior to June 2010. *Id.* The ALJ indicated that no treating physician limited Plaintiff's ability to work. *Id.* Finally, the ALJ gave significant weight to Dr. Hutson's opinion that Plaintiff was limited to light work. *Id.*

According to the U.S. National Library of Medicine, a service of the National Institutes of Health "[k]idney disease is the slow loss of kidney function over time" and is often caused by diabetes and high blood pressure. A.D.A.M. Medical Encyclopedia [Internet]. Atlanta (GA): A.D.A.M., Inc.; ©1997–2014. *Chronic kidney disease*; [updated 2 Oct. 2013; accessed 19 Nov. 2014]. Available from: http://www.nlm.nih.gov /medlineplus/ency/article/000471.htm.[4] It is possible for individuals with chronic kidney disease to experience no symptoms until their kidneys have almost stopped working. *Id.* Symptoms of chronic kidney disease are generally mild in the early stages and may include appetite loss, general ill feeling and fatigue, headaches, itching and dry skin, nausea, and unintended weight loss. *Id.* Symptoms that appear in conjunction with significantly reduced kidney function include abnormally dark or light skin, bone pain,

---

[4] A court may take judicial notice of factual information located in postings on government websites. *See Phillips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("court may take judicial notice of matters of public record").

drowsiness or problems concentrating or thinking, numbness or swelling in the hands and feet, muscle twitching or cramps, breath odor, easy bruising or blood in the stool, excessive thirst, frequent hiccups, problems with sexual function, shortness of breath, sleep disturbance, and vomiting. *Id.* Tests that indicate how well the kidneys are functioning include creatinine clearance (measured as GFR),[5] creatinine levels,[6] and BUN.[7] *Id.* Anemia is one of many possible complications of chronic kidney disease. *Id.*

The undersigned recommends a finding that the ALJ did not err in failing to call a medical expert to testify. Plaintiff cites the Fourth Circuit's decision in *Bailey v. Chater*, 68 F.3d 75 (4th Cir. 1995), and this court's order on the motion for a consent remand in

---

[5] GFR indicates how well the kidneys' filtering units are functioning. A.D.A.M. Medical Encyclopedia [Internet]. Seattle (WA): A.D.A.M., Inc.; ©1997–2014. *Creatinine clearance test*; [updated 25 Aug. 2013; accessed 19 Nov. 2014]. Available from: http://www.nlm.nih.gov/medlineplus/ency/article/003611.htm. GFR results below 60 mL/minute for three or more months are a sign of chronic kidney disease. A.D.A.M. Medical Encyclopedia [Internet]. Seattle (WA): A.D.A.M., Inc.; ©1997–2014. *Glomerular filtration rate*; [updated; accessed 25 Nov. 2014]. Available from: http://www.nlm.nih.gov/medlineplus/ency/article/007305.htm.

[6] According to the U.S. National Library of Medicine, a service of the National Institutes of Health, creatinine is a chemical waste product of creatine, a chemical used to supply energy to the muscles. A.D.A.M. Medical Encyclopedia [Internet]. Seattle (WA): A.D.A.M., Inc.; ©1997–2014. *Creatinine blood test*; [updated 4 Aug. 2013; accessed 19 Nov. 2014]. Available from: http://www.nlm.nih.gov/medlineplus/ency/article/003475.htm. Creatinine levels in the blood increase when an individual's kidneys are not releasing adequate amounts of creatinine through urination. *Id.* High creatinine levels may be the result of a blocked urinary tract, kidney problems, dehydration, or muscle problems. *Id.* Low creatinine may be due to muscle or nerve problems. *Id.*

[7] The BUN test is used to assess kidney function. A.D.A.M. Medical Encyclopedia [Internet]. Seattle (WA): A.D.A.M., Inc.; ©1997–2014. *BUN-blood test*; [updated 23 Aug. 2013; accessed 19 Nov. 2014]. Available from: http://www.nlm.nih.gov/medlineplus/ency/article/007305.htm. Higher than normal values may be associated with congestive heart failure, excessive protein in the gastrointestinal tract, gastrointestinal bleeding, dehydration, heart attack, kidney disease, kidney failure, shock, and urinary tract obstruction. *Id.* Lower than normal values may be result from liver failure, a low-protein diet, malnutrition, and over-hydration. *Id.*

*Zelasko v. Colvin*, C/A No. 5:13-1454-MGL (D.S.C. Mar. 5, 2014), to argue that a medical expert is required when a claimant's onset date must be inferred. However, this case is distinguishable from both *Bailey* and *Zelasko* because the record in the instant case contained sufficient evidence so that an onset date does not have to be inferred. Although Plaintiff had a significant gap in medical treatment between October 2007 and April 2009, there were sufficient records and medical opinions after April 2009 to establish Plaintiff's onset date.

The undersigned recommends a finding that the established onset date was consistent with the medical evidence and the facts in the case record. The record reflects that Plaintiff's kidney functioning worsened between April 2009 and June 2010, but the ALJ reached a reasonable conclusion as to when it became disabling in light of the medical evidence of record. When Plaintiff presented to the emergency department at St. Francis Hospital on April 13, 2009, he had some symptoms of chronic kidney disease, including nausea, vomiting, reduced hemoglobin, and elevated creatinine, but his reduced hemoglobin and elevated creatinine were not significantly outside the normal range. *See* Tr. at 269. By the time Plaintiff followed up with Dr. Newton on April 15, 2009, his creatinine was normal. Tr. at 799. Although he complained of a recent onset of decreased energy, which is a symptom consistent with chronic kidney disease, his glucose was still significantly elevated.[8] Tr. at 325. Plaintiff's creatinine and BUN increased after April

---

[8] Fatigue is a common symptom of diabetes. A.D.A.M. Medical Encyclopedia [Internet]. Seattle (WA): A.D.A.M., Inc.; ©1997–2014. *Diabetes*; [updated 5 Aug. 2014; accessed 19 Nov. 2014]. Available from: http://www.nlm.nih.gov/medlineplus/ency/article/001214.htm.

27, 2009, but his GFR remained in normal range until August 12, 2009. Tr. at 755, 778–79, 781, 783, 784. Plaintiff's hemoglobin fluctuated over time. *See* Tr. at 273 (11.5 g/dL on April 13, 2009), 323 (10.7 g/DL on May 15, 2009), 321 (9.3 g/dL in July 15, 2009), 320 (10 g/dL on August 12, 2009), 263 (8.8 g/dL on October 24, 2009), 317 (8.0 g/dL on December 8, 2009). Despite the abnormal lab results, Dr. Newton repeatedly observed Plaintiff to be well. *See* Tr. at 321 ("doing well" on July 15, 2009), 320 ("doing great" on August 12, 2009), 315 ("doing well" on February 12, 2010). On March 12, 2010, Plaintiff indicated he felt a little tired. Tr. at 314. However, on May 16, 2010, Dr. Newton wrote that Plaintiff "[f]eels good overall." *See* Tr. at 312. In light of Dr. Newton's indications that Plaintiff was doing well and little evidence of severe symptoms of chronic kidney disease outside of abnormal lab test results, it was reasonable for the ALJ to conclude that Plaintiff was capable of engaging in light work during that time period. To support his determination that Plaintiff's impairment reached a disabling level on June 4, 2010, the ALJ noted that Plaintiff began receiving blood transfusions in June 2010 and was diagnosed with stage III kidney disease in July 2010, two significant factors that indicated exacerbation of his condition. *See* Tr. at 19.

The undersigned further recommends a finding that the ALJ reasonably relied upon the opinions of the state agency medical consultants to establish Plaintiff's disability onset date. Although the ALJ erroneously indicated that Dr. Hutson reviewed the medical evidence through Plaintiff's date last insured and concluded Plaintiff could perform work at the light exertional level, when Dr. Hutson actually indicated that there was insufficient evidence to rate Plaintiff's residual functional capacity from January 1,

2005, through June 30, 2009, this error was harmless. Where "the ALJ conducted the proper analysis in a comprehensive fashion and cited substantial evidence to support his finding," and where "there is no question but that he would have reached the same result notwithstanding his initial error," the ALJ's error does not warrant remand. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994). Dr. Hutson indicated that Plaintiff's impairments limited him to the performance of light work. *See* Tr. at 368–75. The ALJ gave great weight to Dr. Farkas's opinion limiting Plaintiff to sedentary work with additional limitations for the period from June 4, 2010, through the date of the decision in light of the evidence that Plaintiff's impairments worsened after June 2010. *See* Tr. at 19–20. Therefore, Dr. Hutson's assessment effectively applied to the period from July 1, 2009, to June 3, 2010, a period in which Plaintiff's renal functioning was gradually decreasing, and nothing in the record suggests that Dr. Hutson would have assessed a more restrictive RFC for the period prior to June 30, 2009.

The undersigned also acknowledges that according to the Social Security Administration's Program Operations Manual Systems ("POMS"), retroactive benefits cannot be paid in SSI claims, and the earliest possible established onset date in an SSI claim is the application filing date or protective filing date. POMS DI 25501.370(A)(1). Plaintiff argues that "nothing happened" on June 4, 2010, "except that Mr. Lewis applied for Social Security benefits." [ECF No. 18 at 1]. However, June 4, 2010, was significant because Plaintiff's failure to prove he was disabled prior to June 30, 2009, effectively transformed the claim into a claim for SSI only and made the filing date the earliest possible established onset date. Although the record reflected steady declines in

Plaintiff's creatinine, BUN, GFR, and hemoglobin after August 2009, June 4, 2010, was the earliest possible date Plaintiff could be paid benefits.[9]

> 2.    RFC Assessment

Plaintiff argues the ALJ's RFC assessment was not supported by substantial evidence. [ECF No. 15 at 10]. Plaintiff contends that the ALJ's RFC assessment was tainted by several erroneous factual findings. *Id.* at 11–12. Plaintiff maintains the ALJ failed to explain and support his RFC finding. *Id.* at 13.

The Commissioner argues that the ALJ properly assessed Plaintiff as having the RFC to perform light work prior to June 4, 2010. [ECF No. 17 at 11].

Pursuant to SSR 96-8p, the RFC assessment must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule, describe the maximum amount of each work-related activity the individual can perform based upon the evidence in the case record, and resolve any material inconsistencies or ambiguities in the evidence. *Id.*

---

[9] This finding is not meant to undermine the ALJ's conclusion that Dr. Hutson's RFC assessment carried great weight for the period before June 4, 2010, or to suggest that Plaintiff's actual onset date was between August 12, 2009 (when GFR declined below 60) and June 3, 2010. It is merely meant to address Plaintiff's argument regarding the insignificance of June 4, 2010.

The ALJ found that prior to June 4, 2010, Plaintiff had the RFC to perform the full range of light work and could lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for six hours each in an eight-hour workday, with normal breaks. Tr. at 16. The ALJ found that beginning June 4, 2010, the claimant had the RFC to perform sedentary work, but he could never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; and must avoid even moderate exposure to hazards. Tr. at 19.

The undersigned recommends a finding that the ALJ properly assessed Plaintiff's RFC. Plaintiff correctly notes that the ALJ erred in indicating that the record did not reflect a diagnosis of anemia prior to June 2010. However, the ALJ noted elsewhere in the decision that Plaintiff was diagnosed with anemia in May 2009, but reported in August 2009 that he was "doing great." *See* Tr. at 18. Therefore, despite his statement to the contrary, the ALJ considered Plaintiff's diagnosis of anemia prior to June 4, 2010, and his error is harmless. *See Mickles*, 29 F.3d at 921. Plaintiff further argues that the ALJ ignored evidence of elevated creatinine prior to his date last insured and that elevated creatinine showed Plaintiff had renal insufficiency. The undersigned notes that the ALJ did not find that Plaintiff did not have renal insufficiency, but rather that he "received sparse medical treatment for this condition" prior to June 4, 2010, which is confirmed by the record. *See* Tr. at 18. Although the record reflects abnormal lab results prior to June 4, 2010, including increasing creatinine and BUN, Plaintiff was not

diagnosed with stage 3 chronic kidney disease until after his date last insured.[10] Furthermore, the ALJ did not base his RFC assessment on when Plaintiff first demonstrated evidence of the impairment, but rather when the symptoms of the impairment reduced Plaintiff to perform a diminished range of sedentary work activity. *See* Tr. at 16–19.

The undersigned recommends a finding that the ALJ provided a well-reasoned discussion describing how the evidence supported each of his conclusions in accordance with SSR 96-8p. The ALJ indicated that there were no treatment notes or medical records to support a finding that Plaintiff became disabled on his alleged onset date and that Plaintiff received "relatively minimal medical treatment for any of his conditions" and reported "doing well" through June 3, 2010. Tr. at 18. In the absence of opinion evidence from treating physicians, the ALJ considered the opinions of the state agency medical consultants and found that they were supported by the objective medical evidence. *See* Tr. at 18, 19. The ALJ discussed medical evidence that indicated an exacerbation of Plaintiff's chronic kidney disease and anemia requiring blood transfusion in June 2010, as well as Plaintiff's subsequent decline in functioning until dialysis was initiated in September 2011. Tr. at 19. In light of the foregoing, the undersigned concludes that the ALJ relied on sufficient evidence in the record to support his RFC assessment.

---

[10] Plaintiff's GFR was consistent with stage 2 chronic kidney disease before August 12, 2009, but dropped to 54.7 mL/minute on August 12, 2009, and met the diagnostic criteria for stage 3 chronic kidney disease when measured at 51.5 mL/minute on November 20, 2009. *See* Tr. at 755, 764. Dr. Keogh indicated renal insufficiency may be the source of Plaintiff's anemia on May 12, 2010, and indicated "renal insufficiency" as a diagnostic impression on June 16, 2010. Tr. at 235, 237. Dr. Franklin diagnosed stage 3 chronic kidney disease on July 9, 2010. Tr. at 329.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

November 19, 2014                                    Shiva V. Hodges
Columbia, South Carolina                            United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).